USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 03/26/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

KELLIE D. HAKE et al.,

                                                      Plaintiffs,

                            -against-

CITIBANK, N.A. et al.,

                                                     Defendants.
-----------------------------------------------------------------X

**19-mc-00125 (JGK) (KHP)**

**OPINION AND ORDER**

**KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

      Plaintiffs are individuals injured in terrorist attacks committed by the Islamic Republic of Iran ("Iran") through its agents, including the Islamic Revolutionary Guard Corps ("IRGC"), the IRGC's "Qods Force" foreign operations directorate ("IRGC-QF"), Hezbollah, and Hamas. Plaintiff Hake is the lead plaintiff in a lawsuit pending in the U.S. District Court for the District of Columbia (the "Hake Case")[1] against: Iran's central bank, Bank Markazi Jomhouri Islami Iran ("Bank Markazi"); Bank Melli Iran ("Bank Melli"); and the National Iranian Oil Company ("NIOC"). Plaintiff Gill is the plaintiff in a lawsuit against Iran also pending in the D.D.C. (the "Gill Case").[2] Both Plaintiffs served non-party subpoenas pursuant to Federal Rule of Civil Procedure 45 ("Rule 45") on various banks to obtain documents needed in their respective lawsuits. They filed this action to compel compliance with their subpoenas. Plaintiffs have resolved their issues with all of the banks except HSBC Bank USA N.A. ("HBUS"). This Opinion addresses the outstanding issues with respect to the subpoenas served on HBUS.

---

[1] *Hake v. Bank Markazi Jomhouri Islami Iran*, No. 17-cv-114 (TJK) (D.D.C.).

[2] *Gill v. Islamic Republic of Iran*, No. 15-cv-2272 (RBW) (D.D.C.).

**BACKGROUND**

Bank Markazi, Bank Melli, and NIOC have defaulted in the Hake Case. The Hake Plaintiffs are in the process of submitting an application for a default judgment and must establish their claims and right to relief through sufficient evidence. *See* 28 U.S.C. § 1608(e). The Hake Plaintiffs' subpoena is aimed at locating documents that will assist them in their motion for a default judgment—that is, documents establishing that Bank Markazi, Bank Melli, and NIOC provided material support to the IRGC, IRGC-QF, Hezbollah, and other Iranian agents and proxies responsible for the terrorist attacks that injured them. HBUS cleared U.S. dollar-denominated transactions in New York for Iranian banks. Plaintiffs believe that at least a portion of the transactions were for the benefit of Bank Markazi, Bank Melli, NIOC and/or others who carried out the terrorist attacks and/or funded the terrorist attacks in which they were injured. Accordingly, their subpoena was aimed at collecting any information HBUS has that reflects details of the U.S. dollar transactions performed for or involving Bank Melli, Bank Markazi, NIOC, and other Iranian entities identified in their subpoena as "Subject Entities," including NIOC's alleged aliases and alter-egos, Bank Markazi's related entities, Bank Melli's related entities, Bank Saderat Iran, and Al-Bilad Islamic Bank and its related entities.

Plaintiff Gill, who was injured in a 2008 Hamas-perpetrated terrorist attack, already prevailed in his case against Iran and was awarded $30 million. Gill served two subpoenas on HBUS to help identify Iranian assets to satisfy the judgment. Gill is looking for the same type of transaction records as the Hake Plaintiffs, believing the subpoenaed information may help locate or identify assets belonging to Iran or its agents, including Hamas, the IRGC, and

Hezbollah. Gill's subpoenas are broader than the Hake Plaintiffs' subpoena, insofar as they identify many more "Subject Entities."

Plaintiffs had good reason to serve HBUS with their subpoenas. In December 2012, HSBC Holdings plc ("HSBC Holdings"), the indirect and ultimate parent of HBUS, and HBUS entered into a deferred prosecution agreement for offering U.S. dollar clearing services to six Iranian banks (the "DPA"). These services were offered through HBUS's foreign affiliates' correspondent accounts with HBUS, in violation of U.S. law and U.S. sanctions against Iran. As part of the settlement, HSBC forfeited approximately $1.2 billion to the U.S. government. Cahill Gordon & Reindel LLP ("Cahill") and Sullivan & Cromwell LLP ("Sullivan") represented HBUS and HSBC Holdings in connection with the DPA.

Prior to entering into the DPA, HSBC Holdings engaged Deloitte LLP in the United Kingdom ("Deloitte U.K.") to conduct a review of U.S. dollar funds transfers passing through its U.K. and Hong Kong SWIFT[3] messaging gateways. The review was conducted under the supervision of HSBC Holdings' outside counsel, Cahill and Sullivan. Some information from the review was shared with U.S. governmental entities, including the U.S. Senate Permanent Subcommittee on Investigations ("PSI") and the U.S. Office of the Comptroller of the Currency ("OCC"). Although the information shared with the government is not fully public, certain information was made public. For example, the PSI issued a report in which it noted that "[a]ccording to an ongoing outside audit requested by HSBC, from 2001 to 2007, HBEU [HSBC Bank plc] and HBME [HSBC Middle East] sent through their U.S. dollar accounts at HBUS and

---

[3] The Society for Worldwide Interbank Financial Telecommunication ("SWIFT") system is a messaging network used by banks and financial institutions to transfer money internationally and securely. *See* https://www.swift.com/ (last accessed Mar. 23, 2020).

3

elsewhere nearly 25,000 OFAC[4] sensitive transactions involving Iran totaling $19.4 billion." PSI, U.S. VULNERABILITIES TO MONEY LAUNDERING, DRUGS, AND TERRORIST FINANCING: HSBC CASE HISTORY 166 (July 17, 2012), https://www.hsgac.senate.gov/imo/media/doc/PSI%20REPORT-HSBC%20CASE%20HISTORY%20(9.6).pdf [hereinafter the "Senate Report"]. Some of the example HBUS transactions noted in the Senate Report were for Bank Melli.

## THE SUBPOENAS

The subpoena issued by the Plaintiffs in the Hake Case requested the following documents for the time period of 2003 through 2010:

1. Transactional Records involving any Subject Entity, including any Transaction Records relating to any U.S. dollar-denominated Transaction relating to or involving or including as a party or intermediary any Subject Entity, including as to each, but not limited to:

    a. Documents sufficient to identify the originators, intermediaries and beneficiaries, including any financial institutions, accounts, or Correspondent Accounts involved in facilitating any step of the Transaction;

    b. Documents sufficient to identify the name and number of the account of the originators, intermediaries, and beneficiaries of each Transaction; and

    c. Documents sufficient to identify the date and value (in U.S. Dollars) of any Transaction.

    d. Unstructured S.W.I.F.T. messages sufficient to identify the true name and account number of any U.S. dollar-denominated transaction initiated [by] or for the benefit of Subject Entity.

2. Non-privileged documents and communications sufficient to identify and/or summarize all Transactions or analysis relating to or involving the Subject Entities, including:

---
[4] "OFAC" is the U.S. Office of Foreign Assets Control.

4

a. Responsive portions of any productions or reports prepared either internally or created by a third party that relate to the Subject Entities; and

   b. Responsive portions of any reports or analyses whether prepared by You or received by You relating to the Subject Entities.

The subpoenas issued by Gill similarly requested:

1. Transactional Records involving any Subject Entity, including any Transaction Records relating to any Transaction to, by, for, for the benefit of, or including as an intermediary any Subject Entity, including as to each, but not limited to:

   a. Documents sufficient to identify the originators, intermediaries and beneficiaries, including any financial institutions, accounts, or Correspondent Accounts involved in facilitating any step of the Transaction;

   b. Documents sufficient to identify the name and number of the account of the originators, intermediaries, and beneficiaries of each Transaction; and

   c. Documents sufficient to identify the date and value (in U.S. Dollars) of any Transaction.

**HBUS'S EFFORTS TO LOCATE AND PRODUCE RESPONSIVE DOCUMENTS**

Upon receiving the subpoenas, HBUS identified the payment database through which all HBUS payments are routed. (Doc. No. 114 ("Transcript of January 9, 2020 Court Conference") 15-16; Doc. No. 121 ("Transcript of February 18, 2020 Court Conference") 10-11.) It then cooperated with Plaintiffs and negotiated an ESI protocol that included 400 search terms to run against that database for the period of 2001 to 2011 – a time period broader than set forth in the subpoenas. HBUS ran the search and produced the results of its search with an explanation of what the records represented. The search, however, did not reveal as many transactions as Plaintiffs' counsel expected—only 246 responsive transactions were identified. The low

5

number of responsive transactions is attributable to the fact that many of the transaction records in HBUS's database lack certain information, such as SWIFT transaction messages, that might link a transaction to Iran. As noted above, HBUS's foreign affiliates stripped this type of information from the transactions before sending them to HBUS to avoid detection by U.S. regulators.[5] Plaintiffs then requested additional data fields concerning the financial transactions, which HBUS produced.

Plaintiffs' counsel asked whether there were additional sources of data and investigatory materials in HBUS's possession that could contain information responsive to the subpoenas. Counsel for HBUS further investigated, including by conferring with outside counsel from Cahill and Sullivan. Based on those inquiries, HBUS's counsel determined there were no other sources of data to search within HBUS, and no responsive investigatory records in HBUS's possession, custody, and control. HBUS's counsel also assured the Court that HBUS's outside counsel, who assisted with the governmental investigations, conducted a diligent search of their past productions to government regulators to locate responsive documents, but that the searches came up empty. (Transcript of January 9, 2020 Court Conference 17-18; Transcript of February 18, 2020 Court Conference 12.)

Plaintiffs' counsel noted that the Senate Report indicated that *HBUS* had hired Deloitte U.K. to identify and examine OFAC sensitive transactions, and that Deloitte had identified more than 25,000 such transactions involving Iran. It also indicated that Deloitte U.K. had determined that 10 percent of the transactions were *unstripped,* suggesting that more than 246

---

[5] None of the specific transactions for Bank Melli noted by the PSI in the Senate Report were included in HBUS's production.

6

transaction records should have been located through the search. Accordingly, Plaintiffs asked HBUS to produce a report prepared by Deloitte U.K. that was provided to the PSI and the OCC (the "Deloitte Report"), as well as the data Deloitte U.K. reviewed to prepare the Report (the "Source Data"). HBUS's counsel then went back to its client and its former outside counsel to follow up on this request. HBUS's counsel then learned that the Senate Report was erroneous, and that HBUS did not retain Deloitte U.K. or provide it any data to review. HBUS was also never provided and did not have a copy of the Deloitte Report. Rather, HBUS's counsel informed the Court that its parent company, HSBC Holdings, commissioned Deloitte U.K. through its outside counsel and that HSBC Holdings has both the Deloitte Report and the underlying Source Data in Europe. HBUS's counsel also informed the Court that all of the Source Data was collected from outside the United States, reviewed by Deloitte U.K. outside of the United States, and was not HBUS data. HBUS did not direct Deloitte U.K. to review the Source Data, nor did it provide any results of that review to the U.S. government. Additionally, counsel informed the Court that no Source Data was ever turned over to the U.S. government. Counsel further clarified that the 25,000 transactions did not all involve HBUS, and that some transactions may have been cleared through other U.S. banks. (Transcript of January 9, 2020 Court Conference 16-21.)

At this Court's direction, HBUS's counsel produced sworn declarations to support the representations they made about the Source Data and the Deloitte U.K. audit and Report. According to the affidavit prepared by a partner at Cahill, HSBC Holdings, through counsel, engaged Deloitte U.K. to review U.S. dollar funds transfers passing through the U.K. and Hong Kong transactional gateways. Deloitte also reviewed transactional data from a Dubai gateway,

7

which fed into the U.K. gateway. The Source Data reviewed did not include data collected from HBUS, and was never brought into the United States due to data protection and financial privacy considerations, among others. The review evaluated transactions involving Cuba, Iran, Libya, Myanmar, North Korea, Sudan, and Syria. HBUS was not a party to the Deloitte U.K. review engagement. The Deloitte Report, which was presented to U.S. governmental authorities, provided aggregated results reflecting the volume of transactions sent via the United States that potentially related to the various countries referenced above. The same information was provided to the OCC and PSI. "Aside from a handful of example payment messages where parties to the transactions were anonymized, the . . . [Deloitte] presentation did not contain individual transaction details." (Doc. No. 117-2 ("Best Decl.") ¶ 9.) In other words, the Deloitte Report did not contain the transactional information Plaintiffs are seeking. Counsel also informed the Court that the Source Data is now archived given its age, and that there are approximately nine terabytes of data on backup tapes. (Transcript of February 18, 2020 Court Conference 14.)

Plaintiffs now seek to compel HBUS to produce the Deloitte Report and the underlying Source Data in the possession of its corporate parent located in the U.K., HSBC Holdings, and/or HSBC Holdings' agent, Deloitte U.K. Because Cahill oversaw the preparation of Deloitte's Report, Plaintiffs contend that Cahill must have received copies of those documents in the United States. Further, because Cahill represented both HSBC Holdings and HBUS in connection with the U.S. government investigations and DPA, Plaintiffs argue that the Source Data and Deloitte Report are within HBUS's possession, custody, and control and must be produced.

8

Plaintiffs argue the Source Data is relevant, insofar as it may reflect transactions conducted for Iran, Bank Markazi, Bank Melli, NIOC, and other Subject Entities that may be linked to the terrorist attacks on Plaintiffs or reflect the whereabouts of Iran's assets. Plaintiffs' counsel argues that Cahill cannot erect a wall within its joint representation of HSBC Holdings and HBUS in the same action, and that HBUS necessarily must be deemed to have control over the Source Data and Deloitte Report. Plaintiffs' counsel also argues that because HBUS should have had access to the underlying Source Data in the normal course, it must, as a matter of law, be presumed to have possession, custody, and control over the Data despite the fact that the Data technically was never in the United States and is in the possession of European entities. Plaintiffs further argue that their requests are proportional to the needs of their case given the nature of their injuries, their present lack of evidence as to how the defendants in their cases moved U.S. dollars to "Iran's terror apparatus," and their substantial damages.

HBUS contends it has fully complied with the subpoenas, consistent with its obligations under the Federal Rules of Civil Procedure, and that Plaintiffs' motion to compel this additional information should be denied. It argues that possession, custody, and control of the Source Data cannot be imputed to HBUS in light of sworn declarations it has produced demonstrating that the Source Data does not belong to HBUS, never entered the United States, and is not available to HBUS simply because HBUS and HSBC Holdings were represented by the same law firm in the long concluded governmental investigations. It asserts that neither Rule 45, nor any other law, permits a party to serve a subpoena on a U.S. entity to obtain data that has never entered the United States and is in the exclusive control of its European parent company merely because the U.S. entity and its parent formerly shared the same counsel. HBUS

contends that the proper procedure is for Plaintiffs to serve a subpoena on HSBC Holdings pursuant to the Hague Evidence Convention.

**DISCUSSION**

Federal Rule of Civil Procedure 26(b) states that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). This includes discovery from non-parties. *See Malibu Media, LLC v. Doe*, No. 15-CV-3147 (AJN), 2016 WL 5478433, at *3–4 (S.D.N.Y. Sept. 29, 2016) (subpoenas issued to non-parties "are subject to the relevance requirement of Rule 26(b)(1), which provides that parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense" (internal quotation marks, citation, and alteration omitted)); *see also In re Refco Sec. Litig.*, 759 F. Supp. 2d 342, 345 (S.D.N.Y. 2011) (same). Rule 45 sets forth the standards and procedures for obtaining discovery from non-parties. Among other things, the party "serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). The recipient of a subpoena may move to quash or modify the subpoena pursuant to Rule 45(d)(3) due to, among other reasons, undue burden.

It is the burden of the party seeking the documents to demonstrate that the documents are relevant and within the bounds of discovery permitted by Rule 26(b). *See Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 144–45 (2014); *Night Hawk Ltd. v. Briarpatch Ltd., LP*, No. 03 Civ.1382 (RWS), 2003 WL 23018833, at *8 (S.D.N.Y. Dec. 23, 2003); *see also* Fed. R. Civ. P. 26(g)(1)(B)(iii) (proponent of discovery must certify that discovery sought is "neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior

discovery in the case, the amount in controversy, and the importance of the issues at stake in the action."). If the recipient of the subpoena objects to producing the information requested in whole or in part, it has the burden to demonstrate that the subpoena is unduly burdensome or provide other reasons why it should not be required to produce the documents requested. *See Jones v. Hirschfeld,* 219 F.R.D. 71, 74–75 (S.D.N.Y. 2003).

In this case, Plaintiffs contend the Source Data and Deloitte Report are relevant and proportional to the needs of their cases. They explain that records of the U.S. dollar clearance transactions will demonstrate the amount of washed money to which certain organizations, such as the IRGC, had access. (Transcript of January 9, 2020 Court Conference 8.) They also explain that the transaction records might identify currently unknown customers of Bank Melli or Bank Markazi that could be linked to Iran's "terror apparatus." (*Id*. at 9.) The archived Source Data held by HSBC Holdings and/or Deloitte U.K. would have information identifying Bank Melli or Bank Markazi. However, as Plaintiffs concede, the Source Data would not necessarily contain information about the underlying clients. Thus, it is unclear to what extent any transaction record could be linked to the IRGC, the IRGC-QF, Hamas or Hezbollah. In other words, Plaintiffs are seeking needles in a haystack that are only marginally relevant.

Additionally, the Hake Plaintiffs, arguably, do not need the information they seek given the low burden of proof for obtaining a default judgment. To obtain a default judgment, the Hake Plaintiffs "need only introduce sufficient evidence 'to allow an issue to go to a jury . . . a burden akin to the requirement of substantial evidence in administrative law.'" *Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 173 (D.D.C. 2016) (alteration in original) (quoting *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 276 (D.D.C. 2016), *aff'd*, 864 F.3d 751 (D.C.

Cir. 2017)); *see also Owens*, 174 F. Supp. 3d at 276 ("[I]n cases where the defendant offers little or no evidence of its own, even a meager showing by the plaintiff will suffice."); *Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 6 (D.D.C. 2011) (Section 1608(e) is not "designed to impose the onerous burden of re-litigating key facts in related cases arising out of the same terrorist attack." (internal quotation marks and citation omitted)). The presiding judge in the Hake Case has indicated that the court could "take judicial notice of the evidentiary record in [another similar] case and, from that, make certain factual findings that obviate the need for [Plaintiffs] to re-present the same evidence." (Doc. No. 51 (quoting *Hake v. Bank Markazi Jomhouri Islami Iran*, No. 17-cv-114 (TJK) (D.D.C.), April 2018 Transcript of Court Conference, 18:10-24:14)); *see also* 28 U.S.C. § 1608(e); *Flanagan*, 190 F. Supp. 3d at 178–79. Additionally, the Hake Plaintiffs have already obtained some records from HBUS, and the many other banks they subpoenaed, that will assist them with their motion for a default judgment.

Plaintiff Gill seeks the records for purposes of locating assets to satisfy a judgment. However, records of completed wire transfers do not identify any attachable assets; rather, they demonstrate the movement of funds on a particular date. It is also highly unlikely that transfer records from 2010 and earlier will enable Gill to find assets that could satisfy his judgment today. Thus, the records do not appear relevant to the Gill Case at all.

While the relevance standard under Rule 26 is broad, assuming Plaintiffs have met their burden of demonstrating relevance with respect to the Source Data, the need for the documents sought, as articulated by Plaintiffs, is marginal at best. Given the marginal relevance of these documents, the burden of restoring and searching archived data, and the potential issues that may arise when transferring the data to the United States due to privacy concerns,

Plaintiffs' request for the Source Data is not proportional to the needs of their respective cases. *See Vaigasi v. Solow Mgmt. Corp.*, 11 Civ. 5088 (RMB)(HBP), 2016 WL 616386, *14 (S.D.N.Y. Feb. 16, 2016) ("Proportionality focuses on the marginal utility of the discovery sought.").

With regard to the Deloitte Report, HBUS has presented an affidavit from a partner at Cahill who attests that the Report, which was presented to the Senate PSI and OCC, contained only aggregate information and did not provide details of any individual HBUS transactions. Thus, the Deloitte Report contains no relevant information. Accordingly, Plaintiffs' motion is denied because the Source Data, if relevant, is not proportional to the needs of their cases, and the Deloitte Report is not relevant.

Even if the Source Data sought by Plaintiffs were relevant and proportional to the needs of their respective cases, there is the separate question of whether it is within the possession, custody, and control of HBUS. In general, a company has possession, custody, and control over its own documents, as well as documents in the possession of its agents, such as attorneys and accountants, who hold documents provided by and belonging to the company. *See Raimey v. Wright Nat. Flood Ins. Co.*, 76 F. Supp. 3d 452, 470 (E.D.N.Y. 2014) (party had possession of draft reports prepared by its experts); *Polanco v. NCO Portfolio Mgmt., Inc.*, No. 11 Civ. 7177(DAB)(DF), 2013 WL 3733391, at *2 (S.D.N.Y. July 15, 2013) (party required to produce non-privileged documents in its counsel's possession); *Arkwright Mut. Ins. Co. v. National Union Fire Ins. Co. of Pittsburgh*, No. 90 Civ. 7811 (AGS), 1994 WL 510043, at *3 (S.D.N.Y. 1994) (noting that parties may be deemed to have control over documents in possession of their counsel or accountants). However, here, HBUS never had the Source Data, the Data never entered the United States, and it was not produced in connection with the governmental investigation and

the DPA. The Source Data was collected by HSBC Holdings for the Deloitte Report at the direction of counsel and concerns a broad array of transactions that pertain not just to Iran, but to other countries as well.

"Whether a subpoenaed domestic corporation can be compelled to produce documents held by its foreign parent . . . turns on the nature of the relationship between the entities." *Doe Run Peru S.R.L. v. Trafigura AG*, 3:11mc77 (SRU), 2011 WL 13059042, at *1 (D. Conn. 2011) (first citing *Pitney Bowes, Inc. v. Kern Int'l, Inc.*, 239 F.R.D. 62, 66 (D. Conn. 2006); then citing *Hunter Douglas, Inc. v. Comfortex Corp.*, No. CIV. A. M8–85 (WHP), 1999 WL 14007, at *3 (S.D.N.Y. 1999); then citing 7 MOORE'S FEDERAL PRACTICE § 34.14[2][c] (3d ed. 2000)). Thus, in the parent-subsidiary context, courts in this Circuit have found control where the domestic corporation "can obtain documents from its foreign parent to assist itself in litigation; . . . can easily obtain documents from its parent when it has an interest in doing so; where documents ordinarily flow freely between [the domestic corporation and foreign parent]; or where the domestic corporation has the practical ability to obtain the requested documents for use in its business." *Doe Run Peru S.R.L.*, 2011 WL 13059042, at *2 (internal quotation marks and citation omitted) (finding that plaintiff had not demonstrated that defendant, a domestic corporation, had control over documents in the possession of its foreign affiliate). Importantly, "[t]he burden of establishing control rests with the party seeking the production." *Id*. at *1 (citing *New York ex rel. Boardman v. National R.R. Passenger Corp.*, 233 F.R.D. 259, 268 (N.D.N.Y. 2006)).

For example, in *Linde v. Arab Bank, PLC*, 262 F.R.D. 136 (E.D.N.Y. 2009), the court held that the U.S. subsidiary of an Israeli bank did not have control over its parent's documents, and that service of a subpoena on the subsidiary for production of documents was not effective

against the parent. The court explained that, absent evidence that the parent's "control over the subsidiary's activities . . . [is] so complete that the subsidiary is, in fact, merely a department of the parent," the court lacked personal jurisdiction over the parent and service of a Rule 45 subpoena on the subsidiary could not be deemed effective against the nonresident parent. *Id*. at 142 (internal quotation marks and citations omitted).

Here, there is no evidence that HBUS operates as a mere department of HSBC Holdings. There is no indication that there is overlap of management or board members. There is no evidence suggesting that HSBC Holdings effectively dictates HBUS's operations. Plaintiffs' only basis for contending that HBUS should be able to obtain the Source Data is that it was formerly represented by the same law firms as HSBC Holdings in connection with the governmental investigations and DPA. While it is true that HBUS shared joint defense counsel with HSBC Holdings in the U.S. government's investigation against them and the negotiation of the DPA, that fact does not mean that HBUS has control over Source Data that was never produced as part of their joint defense or shared with HBUS. All that was shared and "produced" was the Deloitte Report, which, as noted above, does not contain relevant information. The cases Plaintiffs cite are inapposite or distinguishable. *See, e.g.*, *Polanco*, 2013 WL 3733391 (in a case that did not concern documents in possession of a foreign parent or co-defendant, the court held that a party cannot avoid discovery by merely asserting that the documents sought are in the possession of its counsel); *625 Milwaukee, LLC v. Switch & Data Facilities Co.*, LLC, No. 06-C-0727, 2008 WL 582564 (E.D. Wis. Feb. 29, 2008) (finding that, where formerly affiliated companies were jointly represented in a prior transaction, one company cannot use attorney–client privilege to prevent the other from obtaining documents created as part of that joint

15

representation in subsequent litigation between them); *Bass Public Ltd. v. Promus Cos.*, 868 F. Supp. 615 (S.D.N.Y. 1994) (same); *M.L.C., Inc. v. North Am. Philips Corp.*, 109 F.R.D. 134 (S.D.N.Y. 1986) (where subsidiary and parent were co-defendants in prior lawsuit, were represented by the same counsel, and the parent company *produced* documents in that lawsuit to aid both parties' defense, the subsidiary had control over the documents because it had a legal right, as a co-defendant, to obtain them from its former counsel); *Cooper Indus., Inc. v. British Aerospace, Inc.*, 102 F.R.D. 918, 919–20 (S.D.N.Y. 1984) (defendant company had custody or control over documents possessed by its U.K. affiliate where defendant's counsel instructed plaintiff to direct its document requests to him because he represented both the defendant and its U.K. affiliate, and the court determined that it was "inconceivable that defendant would not have access to the[ ] documents and the ability to obtain them for its usual business"). Thus, Plaintiffs have failed to demonstrate that HBUS has possession, custody, or control over the Source Data. *See Dartell v. Tibet Pharm., Inc.*, No. 14-cv-3620 (JMV), 2016 WL 11653632 (D.N.J. Feb. 29, 2016) (denying plaintiffs' motion to compel non-party HBUS to comply with a subpoena seeking documents concerning bank account transactions linked to an account located at its Hong Kong affiliate); *Doe Run Peru S.R.L.*, 2011 WL 13059042 (finding that plaintiff failed to demonstrate that defendant, a swiss corporation with its principal place of business in the United States, had control over documents in the possession of its affiliate, which had its principal place of business in Peru); *Linde*, 262 F.R.D. at 141–42 (domestic subsidiary not required to produce documents in possession of corporate parent).

    The Federal Rules permit a party to seek discovery from non-party foreign corporations. However, a Rule 45 subpoena on such an entity must be served by an internationally agreed

means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents.[6]  *See* Fed. R. Civ. P. 4(f); *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*, 262 F.R.D. 293, 307–308 (S.D.N.Y. 2009) (recognizing that the Second Circuit "has permitted service on corporations via international registered mail pursuant to the Hague Convention where the party effecting service submits sufficient proof of service" (citing *Ackermann v. Levine*, 788 F.2d 830, 839 (2d Cir. 1986)).  The service rules cannot be avoided by serving a domestic subsidiary of a foreign corporation.  *See Fujikura Ltd. v. Finisar Corp.*, No. 15-mc-80110-HRL (JSC), 2015 WL 5782351, *7 (N.D. Cal. Oct. 5, 2015) (holding that service of Rule 45 subpoena on U.S. subsidiary of Japanese company violated evidentiary treaty between United States and Japan; subpoenas must be served pursuant to international agreements, otherwise such agreements "would be entirely toothless for a large number of global companies with U.S. subsidiaries").  Plaintiffs' counsel acknowledged to this Court that it could have served HSBC Holdings in the U.K. by utilizing Hague Convention procedure, but elected not to.  (Transcript of January 9, 2020 Court Conference 31.)  This concession is telling.  What Plaintiffs actually seek through their motion is a shortcut around established discovery rules.  Plaintiffs should have, instead, served HSBC Holdings at the outset.

## **CONCLUSION**

For the reasons set forth above, the Court finds that Plaintiffs have failed to meet their burden of showing that the Deloitte Report and underlying Source Data is relevant and

---

[6] The Hague Convention sets forth "certain procedures by which a judicial authority in one contracting state may request evidence located in another contracting state."  *See Société Nationale Industrielle Aérospatiale v. United States Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 524 (1987).

proportional to the needs of their cases. Further, they have failed to show that HBUS has possession, custody and control over the underlying Source Data. Plaintiffs' motion to compel is, therefore, denied. This decision resolves the remaining issues with respect to the one remaining party and, therefore, concludes this action.

SO ORDERED.

Dated: March 26, 2020
New York, New York

_____
KATHARINE H. PARKER
United States Magistrate Judge